## E.    Municipal Liability

Lastly, the plaintiff seeks to hold the City of Grand Rapids liable for the actions of Chief Hegarty on the ground that Hegarty is a final policy-maker for the city. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-481 (1986). But if no liability attaches to the police chief, no liability attaches to the City of Grand Rapids either.

The judgment entered by the district court is **AFFIRMED** in part and **REVERSED** in part. The case is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0389P (6th Cir.)
File Name:  02a0389p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

ANTHONY C. GREENE,
        *Plaintiff-Appellant,*

        *v.*

JACK BARBER, EDWARD
HILLYER, VICTOR GILLIS,
WILLIAM HEGARTY, and the
CITY OF GRAND RAPIDS,
MICHIGAN,
        *Defendants-Appellees.*

No. 01-1247

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 00-00168—Robert Holmes Bell, Chief District Judge.

Argued:  August 1, 2002

Decided and Filed:  November 8, 2002

Before:  NELSON, BOGGS, and NORRIS, Circuit
Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** Michael O. Nelson, Grand Rapids, Michigan, for Appellant. Janice F. Bailey, CITY ATTORNEY'S OFFICE FOR THE CITY OF GRAND RAPIDS, Grand Rapids, Michigan, for Appellees. **ON BRIEF:** Michael O. Nelson, Grand Rapids, Michigan, for Appellant. Janice F. Bailey, CITY ATTORNEY'S OFFICE FOR THE CITY OF GRAND RAPIDS, Grand Rapids, Michigan, for Appellees.

———————————

**OPINION**

———————————

DAVID A. NELSON, Circuit Judge. This is a civil rights action in which the plaintiff claims that three police officers employed by the City of Grand Rapids, Michigan, arrested him without probable cause and in retaliation for his having insulted one of the officers. He further claims that the officers used excessive force. The district court entered summary judgment in favor of both the officers and the remaining defendants, the Grand Rapids chief of police and the city itself.

We shall affirm the judgment except insofar as qualified immunity for the arrest was granted to the officer at whom the insult was directed. That portion of the judgment will be vacated, and the case will be remanded for further proceedings as to this officer only.

I

On the afternoon of March 12, 1997, the plaintiff – Anthony Greene, a six-foot, 300-pound lawyer – went to the Grand Rapids Police Department to retrieve his automobile after it had been towed from a no-parking zone. The police department is located in the hall of justice, a building that houses, in addition to the police department, several

It is undisputed that Mr. Greene was verbally resisting arrest in an aggressive manner. He has offered no evidence, moreover, to counter the officers' testimony that he was also resisting arrest physically. Given the fact that Lt. Barber was simply following established departmental procedures for dealing with non-cooperative arrestees, we do not think he should be deemed to have known that his conduct might be illegal. The district court thus acted properly in granting him qualified immunity on this score.

D.   Supervisory Liability

The plaintiff contends that the three officers' supervisor, Police Chief William Hegarty, is liable for any constitutional infraction that occurred here. Mr. Greene claims that although Chief Hegarty had the authority to stop his subordinate officers, he condoned their actions instead.

For Chief Hegarty to be held liable for his subordinates' behavior, however, he must have played an active role in the alleged violations. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). Supervisory liability under § 1983 does not attach when it is premised on a mere failure to act; it "must be based on active unconstitutional behavior." *Id.* (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989)).

There has been no showing here that Chief Hegarty engaged in any active unconstitutional behavior. See *Bass*, 167 F.3d at 1048. It is undisputed that the chief arrived on the scene only after Lieutenant Barber told the plaintiff that he was under arrest, after the three officers had begun their efforts to restrain him, and after the pepper spray had been administered.

The plaintiff argues that regardless of when Chief Hegarty showed up, he was present for the final moments of the arrest and could have stopped it. But Mr. Greene offers no evidence that Hegarty even knew the reason for the arrest. Under these circumstances, we hold that Police Chief Hegarty cannot be liable for any illegal conduct on the part of a subordinate.

"the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396 (citation omitted).

Mr. Greene's supposed crime was not severe; he was being arrested for creating a low-level disturbance in a public place. He was not threatening anyone's safety or attempting to evade arrest by flight. He does appear, however, to have been actively resisting arrest, and he does not contradict the officers' testimony that he refused to be handcuffed.

On these facts, at least for purposes of analysis, we are prepared to concede that Lt. Barber's use of pepper spray might be found to have constituted excessive force under *Graham*. No excessive force was used by the other officers, however.

Our conclusion as to Lt. Barber requires us to move on to the question whether the right to be free from the level of force used here was clearly established. *Saucier*, 533 U.S. at 201. In other words, we must decide whether it would have been clear to a reasonable police officer in Lt. Barber's position that his conduct was unlawful in the situation he confronted. See *id.* at 202.

We are satisfied that a reasonable officer in Barber's position would not necessarily have known that it might be unlawful for him to use pepper spray on a plaintiff who was actively resisting arrest. According to the Grand Rapids Police Department's Manual of Procedures, police officers are allowed to use oleoresin capsicum in one to two second bursts so long as they comply with the specifications of the "Use of Force Continuum" – another departmental policy document. The Use of Force Continuum permits an officer to administer pepper spray to a person who is aggressively resisting arrest, either verbally or physically.

courtrooms, the prosecutor's office, and the city traffic division. An information counter, staffed by interns, is situated in the lobby of the building.

Mr. Greene spoke to an intern named John Lind about fees that were being demanded for the return of the car. Using an "animated expressive voice" rather than his "normal conversation voice," Greene asked Lind why he was being required to pay storage fees for a period before he had received notice that his car was in storage.

Unable to answer the question, Lind directed Greene to his supervisor, Lieutenant Jack Barber. Greene repeated his question to Barber.

The exchange that followed was subsequently described thus by Mr. Greene:

"Well, Lt. Barber became very arrogant, you know, very very arrogant with me, like, look I don't have to answer your questions, this is the way we do it. You don't like it, you know, that's just like too bad. So I responded to him, you know, you're really being [an] asshole. And he took great exception to that.
                                    * * *
He said to me, 'You can't talk to me like that in my building.'
                                    * * *
I said to him – I responded, I said, 'What do you mean I can't talk to you like this in your building.' I said, 'This is . . .' – this is – 'I'm exercising my freedom of speech.' I said, 'This is the United States of America and we have freedom of speech here and if you don't like it you should move to another country.'
                                    * * *
[He answered], 'Well, not in my building,' again, very adamantly. 'Not in my building,' just like that. And that's when I told him, I said, 'Well, if that's how you feel you're really stupid.' And that's when he turned to me and said, 'You're under arrest.'"

Intern Lind testified that there were approximately 20 to 30 people in the lobby during his discourse with the plaintiff. Lind claimed that by the end of their conversation the bystanders, including those 50 to 60 feet away, had all taken notice of them. He further maintained that the interns answering telephones at the information counter had to place their callers on hold. Mark O'Farrell, another intern, confirmed that the noise was interfering with the operation of the counter.

A third intern, Jenell Strobridge, testified that Mr. Greene could be heard throughout the hall of justice lobby and that Greene engaged the attention of the 25 to 30 people she thought present there. When Mr. Greene called Lieutenant Barber an "asshole," she said, he was not "screaming or anything, but [his voice] was loud enough to attract the attention of other people in the lobby." Based on the record as a whole, and accepting Mr. Greene's testimony as true, it is fair to conclude that Mr. Greene was not speaking *sotto voce*.

On being told he was under arrest, Mr. Greene demanded to know why. Greene testified that Lt. Barber did not answer, but ordered him to place his hands on the counter. Greene refused and started yelling at this point, telling Barber that there was no basis for the arrest and that it was illegal. He also shouted for Grand Rapids Chief of Police William Hegarty (whom he knew) to stop the arrest.

Officer Edward Hillyer was entering the lobby from an adjacent part of the building when he heard Barber tell Greene he was under arrest. Hillyer undertook to help Barber with the arrest, he explained, because it appeared that Greene was not cooperating. Hillyer caught Greene's arm and attempted to steer him toward the information counter, from which Greene was backing away.

Captain Victor Gillis, whose office was located near the information counter, came out at about the same time. He too heard Lt. Barber tell Mr. Greene he was under arrest, and he too assisted in the effort to restrain Greene.

intensive nature of the requisite inquiry, however, we would be usurping the role of the jury were we to attempt to apply the test to Lt. Barber's conduct on this record at this stage of the proceeding.

There is no such problem with respect to the grant of qualified immunity to Officers Hillyer and Gillis. According to the plaintiff's own testimony, these two officers were not present for the events leading up to the arrest. They arrived just as Lt. Barber was advising Mr. Greene that he was under arrest, an event that triggered a verbal explosion. Officers Hillyer and Gillis could reasonably have concluded that the plaintiff was resisting arrest and that they were entitled to assist a fellow officer in making the arrest. Reasonable officers in the position of Hillyer and Gillis would have had no reason to suppose that their conduct was in any way unlawful. We agree with the district court's conclusion that Officers Hillyer and Gillis were entitled to qualified immunity in respect of their role in the plaintiff's arrest.

## C. The Use of Excessive Force

The plaintiff contends that the officers used excessive force in the arrest, thereby violating his clearly established Fourth Amendment right to be free from unreasonable seizures. He claims that because there was no basis for the arrest, any use of force constituted a Fourth Amendment violation. The officers again respond that they are entitled to qualified immunity.

Whether the three officers violated Mr. Greene's right to be free from excessive force is a question that must be analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard requires us to consider

---

*Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998) ("when an officer has *arguable* probable cause to believe that a person is committing a particular public offense, he is entitled to qualified immunity from suit, even if the offender may be speaking at the time he is arrested").

"It is well-established . . . that McCurdy had a constitutional right to challenge verbally Officer Cole's surveillance, and we therefore reverse the district court's grant of qualified immunity to Officer Cole. Because the district court did not address whether McCurdy's arrest was at least partially motivated by protected conduct, we remand for further proceedings." *Id.*

The phrase "at least partially motivated," as used in *McCurdy*, might lend itself to misunderstanding by a reader not familiar with the Supreme Court decision on which it was ultimately based, *Mount Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977). There a unanimous Court held that where constitutionally protected speech is "a 'motivating factor'" in governmental action adverse to the plaintiff, the adverse action is unconstitutional (assuming the requisite degree of seriousness) *unless the same action would have been taken "even in the absence of the protected conduct." Id.* at 287 (emphasis supplied). A "motivating factor," in other words, is one without which the action being challenged simply would not have been taken.

Applying the logic of *Mount Healthy* here, and according *McCurdy* the precedential authority due it, we are constrained to hold that Lt. Barber should have known that an arrest undertaken at least in part as retaliation for a constitutionally protected insult to the officer's dignity would be impermissible unless it could be shown that the officer would have made the arrest even in the absence of any retaliatory motive. If Lt. Barber could persuade a jury that Mr. Greene would have been arrested for disrupting the transaction of business even if the insults had been aimed solely at the intern, for example, and even if there had been no personal pique on Barber's part, the *Mount Healthy* test would be satisfied and (assuming the existence of probable cause) there would be no constitutional violation.[2] Because of the fact-

---

[2] The mere fact that Mr. Greene may have been engaged in constitutionally protected speech at the time of his arrest would not suffice to negate qualified immunity, of course. See *Redd v. City of*

When one of the officers took his arm, Mr. Greene testified, "things just went ballistic." The upshot was that he was sprayed with oleoresin capsicum (commonly known as pepper spray) while both of his arms were being held by the officers. Blinded by the chemical agent, he began stumbling across the lobby.

It took the police officers several moments to handcuff Mr. Greene, even after he had been sprayed. Chief Hegarty finally appeared on the scene and told Greene, "just cooperate and we'll get through this."

Mr. Greene was charged with creating a disturbance, in violation of Grand Rapids Code Section 9.137, and with hindering and opposing a police officer. A Michigan jury ultimately acquitted him of both charges.

Following his acquittal in state court, Mr. Greene brought the present civil rights action in federal district court. The complaint alleged that he had been subjected to an unreasonable arrest without probable cause and solely in retaliation for exercising his First Amendment right of free speech. The complaint further alleged that he was the victim of excessive force. The district court granted a defense motion for summary judgment, and this appeal followed.

II

A.   Standard of Review

Summary judgments are reviewed in this court *de novo.* See *United Nat. Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 449 (6th Cir. 1999). The Federal Rules of Civil Procedure provide that a motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). When deciding if summary judgment is proper, we must view the evidence in the light most favorable to the nonmoving party. See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B.    Qualified Immunity for the Arrest

Mr. Greene contends that the granting of summary judgment was improper because a reasonable jury could have found that he was arrested without probable cause and as a result of his protected speech.  The police officers respond that they were entitled to qualified immunity.

### 1.

In civil damage actions arising out of government officials' performance of discretionary functions, the officials are generally entitled to qualified immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  To determine if qualified immunity attaches, we employ the sequential analysis prescribed by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001).  First we must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged are sufficient to make out a violation of the Constitution. *Saucier*, 533 U.S. at 201.  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id*.

The determination as to whether the right was "clearly established" is a determination that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*.  In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

ordinance, the existence of probable cause would  not justify the arrest if the officer's true motivation was to punish a slight to his dignity.

Taken in the light most favorable to Mr. Greene, we believe that the record before us would entitle a jury to find that the arrest was the product of an improper motive.

We come, then, to the second branch of the *Saucier* analysis:  was Mr. Greene's right not to be arrested for insulting a police officer "clearly established" in March of 1997?  Would it have been clear to a reasonable officer standing in Lt. Barber's shoes, in other words, that he could not make the arrest in retaliation for the insult?

We gave an affirmative answer to a similar question in *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512 (6th Cir. 2001).  That case arose out of an incident that occurred in July of 1996 – a few months before Mr. Greene's arrest – when one James McCurdy, who had been celebrating the graduation of a nephew from college, was conversing with fellow celebrants on a public street at 5 o'clock in the morning.  A passing police officer asked the men what was going on.  In the exchange that followed, Mr. McCurdy, using four-letter words of Anglo-Saxon origin, made known his unwillingness to produce identification or go back inside his house.  He was then placed under arrest.  After concluding that the officer had no probable cause to arrest Mr. McCurdy for violating an Ohio statute that prohibits an intoxicated person from "creat[ing] a condition that presents a risk of physical harm," a divided panel of this court reversed a grant of qualified immunity that reflected the district court's understanding that "it was not clearly established that the First Amendment prohibited an officer from effectuating an otherwise valid arrest if that officer was motivated by a desire to retaliate against the arrestee's assertion of First Amendment rights." *Id*. at 520.

In rejecting the district court's analysis, the *McCurdy* majority said this:

breach of the peace. *Sandul*, 119 F.3d at 1255. In the case at bar, by the same token, it is hard to imagine Mr. Greene's words inciting a breach of the peace by a police officer whose sworn duty it was to uphold the law.[1] See *Buffkins v. City of Omaha*, 922 F.2d 465, 472 (8th Cir. 1990):

> "Buffkins' use of the word 'asshole' could not reasonably have prompted a violent response from the arresting officers. In *Houston v. Hill*, 482 U.S. 451, 462, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1986), the Supreme Court recognized that the 'fighting words' doctrine may be limited in the case of communications addressed to properly trained police officers because police officers are expected to exercise greater restraint in their response than the average citizen. The *Houston* Court stated:
>
>> [T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers . . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.
>
> *Id*. at 462-463, 107 S. Ct. at 2509-11."

Under today's jurisprudence, to recapitulate,

 – Mr. Greene's characterization of Lt. Barber as an "asshole" was not egregious enough to trigger application of the "fighting words" doctrine, and

– although Lt. Barber may have had probable cause to believe that Mr. Greene was violating the Grand Rapids

---

[1]On the other hand, if we may be forgiven an editorial aside, it is hard to imagine a member of a learned profession that once prided itself on civility addressing this kind of gutter language to an officer of the law – and doing so before 20 or 30 people in a hall of justice, of all places.

A police officer may be entitled to qualified immunity, obviously, even though he has in fact violated the plaintiff's rights;  "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. It is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation he confronts. "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id*. See *Anderson*, 483 U.S. at 641 ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable.") (Citation omitted.)

2.

Against this legal background, we begin our qualified immunity analysis in the case at bar as *Saucier* directs:  by determining whether an arrest under the version of the facts alleged by Mr. Greene would have violated Greene's constitutional rights. As far as Lt. Barber is concerned, we conclude that it would be within the province of a jury to accept as true a scenario under which the arrest would indeed be unconstitutional.

The ordinance that Mr. Greene was supposed to have violated, codified at GRAND RAPIDS, MI., CODE § 9.137 (2002), provides in pertinent part that "[n]o person shall: Create or engage in any disturbance, fight or quarrel in a public place." The incident at issue here obviously occurred in a public place, and even under Mr. Greene's version of the facts, we think, a respectable argument can be made that Lt. Barber had probable cause to believe that Greene was engaging in a "disturbance" in such a place. See *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir. 1997).

*Pace Gold*, however, the existence of probable cause is not determinative of the constitutional question if, as alleged here, the plaintiff was arrested in retaliation for his having engaged

in constitutionally protected speech. The law is well established that "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998) (quoting *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984), and *DeLoach v. Beavers*, 922 F.2d 618, 620 (10th Cir. 1990)).

Did Mr. Greene have a constitutionally protected right to call Lt. Barber an "asshole" and castigate him as "stupid?" The answer, we suggest, depends on the time, place, and manner in which Mr. Greene so expressed himself. It is clear that the Constitution gave Mr. Greene no license to interrupt the transaction of public business by loud animadversions on Lt. Barber's personality and mental capacity, or any other subject, for that matter – consider, for example, the likely consequence of someone's interrupting an oral argument in a Sixth Circuit courtroom with a diatribe like Mr. Greene's – but, standing alone, the fact that Mr. Greene's remarks were unflattering to Lt. Barber clearly gave Barber no license to abridge Greene's freedom to speak as he did. "[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or personal slights to their dignity." *Bloch*, 156 F.3d at 682 (quoting *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)).

There was a time, to be sure, when the use of a coarse epithet such as that employed by Mr. Greene would have been thought to lie outside the protection of the First Amendment. See *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), where the Supreme Court affirmed the conviction of an individual held to have violated a New Hampshire law by addressing the following words to a public official – a city marshal – on a public sidewalk near the entrance to the city hall of Rochester, New Hampshire:

"You are a God dammed racketeer" and "a dammed Fascist and the whole government of Rochester are Fascists or agents of Fascists." *Id*. at 569.

In explaining its affirmance of the conviction, the Supreme Court had this to say, among other things:

"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. *These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.* It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. '*Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.*'" *Id*. at 571-72 (footnotes and citation omitted) (emphasis supplied).

In recent years, however, *Chaplinsky*'s "fighting words" doctrine has become "very limited." *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (citing *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989)). Standards of decorum have changed dramatically since 1942, moreover, and indelicacy no longer places speech beyond the protection of the First Amendment. The words and gestures at issue in *Sandul*, for example, were even more vulgar than Mr. Greene's, but they were nonetheless held to be "speech protected by the First Amendment," circumstances present in *Sandul* having made it unlikely that the "speech" there at issue would incite a