Amanda **LANDIS**, Personal Representative for the Estate of Charles Christopher Keiser, Deceased, Plaintiff,

v.

Todd **CARDOZA**, Greg Galarneau, Jason Baker, Jim Lynch, Bill Schuster, and Livingston County, jointly and severally, Defendants.

Civil No. 05–74013.

United States District Court, E.D. Michigan, Southern Division.

Sept. 28, 2007.

John C. Philo, Philo and Whitaker, Detroit, MI, Thomas R. Present, Clinton Township, MI, for Plaintiff.

James T. Farrell, Michigan Department of Attorney General, Lansing, MI, Anne M. McLaughlin, T. Joseph Seward, Cummings, McClorey, Livonia, MI, for Defendants.

## OPINION AND ORDER

JOHN FEIKENS, District Judge.

### I. INTRODUCTION

Plaintiff Amanda Landis ("Landis") filed this suit after her father died while being arrested by officers of the Livingston County Sheriff Department and the Michigan State Police. She has brought claims for constitutional deprivation under 42 U.S.C. § 1983 and assault and battery against the arresting officers (the "Officers") and a claim under 42 U.S.C. § 1983 against Livingston County. All of the Defendants have moved for summary judgment.

For the reasons set forth below, I DENY summary Judgment to Officers Galarneau, Lynch, and Baker and take Livingston County's motion for summary judgment under advisement.

### II. FACTUAL BACKGROUND

On the morning of November 25, 2005, motorists called Livingston County 911 Central Dispatch to report that a bulldozer was blocking southbound traffic on US–23 near the intersection with M–59 in Hartland. A 911 Dispatcher sent Michigan State Police Trooper Todd Cardoza ("Cardoza") and Livingston County Sheriff Department Deputy Oswald ("Oswald") to the scene. Cardoza arrived first and asked Oswald to shut down US–23 southbound.

Cardoza continued down US–23 until he observed a man attempting to enter a front-end loader. Cardoza exited his vehicle and confronted the individual, Charles Keiser ("Keiser") a forty-seven year old resident of Oakland County, Michigan. Cardoza ordered Keiser to stop and attempted to restrain him, but Keiser fled over the fence that separates US–23 and Blaine Road. Michigan State Trooper Greg

Galarneau ("Galarneau"), who had been alerted to the situation, encountered Keiser shortly thereafter walking south on Blaine Road. Galarneau exited his vehicle and ordered Keiser to stop. Keiser then turned and ran the other direction and Galarneau pursued him on foot. Cardoza, who was also pursuing on foot, reached Keiser first and tackled him. Galarneau jumped on top of Keiser and attempted to subdue him by placing his knees on Keiser's shoulder blades.

Despite Galarneau's efforts, Keiser was able to roll over and grab Galarneau by the throat. Galarneau struggled to remove Keiser's hand from his throat and began experiencing pressure in his head and difficulty breathing. Cardoza retrieved Galarneau's baton and struck Keiser with it and Galarneau sprayed Keiser with pepper spray before Keiser released his hold. Keiser then walked into a nearby woods, followed closely by Cardoza and Galarneau. Keiser stopped in a low swampy area and Livingston County Sheriff Department Deputies Jason Baker ("Baker") and Jim Lynch ("Lynch") arrived at the scene.

Keiser refused to obey the officers' orders to give himself up and keep his hands out of his pockets. Lynch shot Keiser with a taser that seemed to have little or no effect. As Keiser was removing the probes from the taser, Galarneau approached Keiser from behind and hit him in the leg with a baton. Lynch and Baker also rushed upon Keiser and during the ensuing struggle, Keiser was hit multiple times with a baton and shocked several times with a taser. At one point during the arrest, Keiser was in the push-up position and as the officers attempted to pull his arms behind him to place him in handcuffs, Keiser's head was submerged in muddy water.

By the time Keiser was handcuffed and dragged to drier ground, he was no longer breathing. The officers did compressions until EMS vehicles arrived. Keiser was transported to the hospital where he was declared dead. An autopsy revealed the presence of thick mud blocking Keiser's airway and concluded that he died as a result of drowning.

## III. ANALYSIS

### A. Summary Judgment

Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To show the existence of a genuine issue, the nonmoving party must have more than a scintilla of evidence to support its position; there must be sufficient evidence that a jury could reasonably find for the nonmoving party. *See Id.* at 252, 106 S.Ct. 2505. In determining whether there is a genuine issue of material fact, the court must view the evidence and the inferences that can be reasonably drawn from it in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Qualified Immunity

 The Officers claim they are entitled to summary judgment on Landis's § 1983 claim based on the doctrine of qualified immunity. "Qualified immunity provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitu-

tional rights of which a reasonable person would have known.'" *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir.2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The issue of whether qualified immunity is applicable to an official's actions is a question of law." *Id.* (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir.1996)). "However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Id.* (quoting *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir.2000)).

The Sixth Circuit has adopted a three-step inquiry for determining whether qualified immunity is proper:

> *First,* we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Second,* we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Third,* we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id.* at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003)). "If the answer to all three of these questions is 'yes,' qualified immunity is not proper." *Id.*

### 1. Constitutional Violation

■ First, I must determine whether, based on applicable law, the facts in this case viewed in the light most favorable to Landis show that a constitutional violation has occurred. Claims that officers used excessive force during an arrest are analyzed under the Forth Amendment's objec-

tively reasonable standard. *See Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether an officer's actions were objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest." *Id.* at 396, 109 S.Ct. 1865.

Analyzing the facts in the light most favorable to Landis, Reiser was suspected of moving construction equipment to block traffic and had actively resisted arrest. He was unarmed, knee deep in water and mud, surrounded by at least four law enforcement officers, and no longer attempting to evade arrest. Reiser was then engaged by the Officers, struck multiple times with a baton, shocked with a taser five times and pushed into a position that submerged his head in muddy water and caused him to drown. When the facts are viewed in this light, the conduct of the Officers is clearly unreasonable.

### 2. Clearly Established Constitutional Right

■ Second, I must determine whether the Officers violated a clearly established constitutional right of which a reasonable person would have known. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*. 319 F.3d at 848.

The Sixth Circuit has held that the right to be free from excessive force is a clearly established Forth Amendment right. *See Neague v. Cynkar,* 258 F.3d 504, 507 (6th Cir.2001). Landis alleges that the Officers used excessive force when they (1) struck Keiser with a police baton more times than was reasonably necessary, (2) shot Keiser with a taser more times than was reasonably necessary and in a manner that was unreasonably dangerous, and (3) pushed Keiser into a position in which his head was submerged in muddy water for an extended period of time. If proven, I believe that each of these acts violates a clearly established constitutional right.

### a. Use of a Police Baton

In regard to the first element of Landis's excessive force claim, the Sixth Circuit has "repeatedly found that a totally gratuitous blow with a night·stick may cross the constitutional line." *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir.1988). The Officers should reasonably have known that striking Keiser more times than was reasonably necessary to subdue him or striking him after he was subdued would constitute a violation of a clearly established constitutional right.

### b. Use of a Police Taser

Whether it should have been clear to the Officers that the gratuitous use of a taser would violate Reiser's constitutional rights is a closer question. I have found only one instance in which the Sixth Circuit has analyzed whether the use of a taser violated a clearly established constitutional right. *See Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir.1992). In *Russo,* the Court found that an officer who fired a taser multiple times at a suspect who had threatened the officer, was armed with two large knives, and was known to be mentally disturbed did not violate a clearly estab-lished constitutional right. *Id.* at 1043–45. The Court noted that although the officer continued firing the taser after the suspect was no longer an immediate threat, "his actions were intended to avoid having to resort to lethal force." *Id.* at 1045.

I believe that the Court's decision in *Russo* does not sufficiently alert officers that unwarranted use of a taser could violate a suspect's constitutional rights. The Supreme Court, however, has clarified that a plaintiff need not demonstrate the existence of a "fundamentally similar" or "materially similar" case in order to show that a right is clearly established. *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "There can be 'notable factual distinctions between the precedents relied on ... so long as the prior decisions g[i]ve reasonable warning that the conduct at issue violated constitutional rights.' " *Champion,* 380 F.3d at 902 (quoting *Hope,* 536 U.S. at 740, 122 S.Ct. 2508).

■ Because of the dearth of Sixth Circuit case law on the issue of taser use, I believe it is fair and appropriate to draw a parallel between tasers and pepper spray. *See Goebel v. Taser International, Inc.,* 2007 WL 2713053, *6 (N.D.Ohio Sept. 14, 2007). Both instruments temporarily incapacitate individuals by causing pain and are intended to permit law enforcement officers to take resisting individuals into custody without having to resort to lethal force. The Sixth Circuit has held that the unwarranted use of pepper spray constitutes excessive force. In *Greene v. Barber,* the Court found that employing pepper spray on a suspect who was resisting arrest but "not threatening anyone's safety or attempting to evade arrest by flight" could constitute excessive force. 310 F.3d 889, 898 (6th Cir.2002); *see also Vaughn v. City of Lebanon,* 18 Fed.Appx. 252, 2001 WL 966279, at *12–13 (6th Cir.2001) (hold-

ing that the use of pepper spray may be unconstitutional when there is no immediate threat to the safety of officers or others). The Court in *Champion* addressed the use of pepper spray on an individual who was already largely subdued: "[I]t is clearly established that the Officers' use of pepper spray against Champion after he was handcuffed and hobbled was excessive." *Champion*, 380 F.3d at 903. In the Sixth Circuit, the unwarranted use of pepper spray violates a suspect's clearly established constitutional rights. Because I believe that this line of reasoning extends equally to the use of tasers, I find that the Sixth Circuit's position on pepper spray also serves as sufficient notice that the unwarranted or improper use of a taser by government officials can constitute excessive force in violation of a suspect's clearly established constitutional rights.

### c. Submergence of Reiser's Head

■ I have found no instances in which the Sixth Circuit has analyzed the actions of officers who restrained a suspect in a position that forced his head underwater, but common sense and analogy lead to me to conclude that, if this allegation is proven, it constitutes the violation of a clearly established constitutional right. In *Champion*, the Sixth Circuit found that "creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." 380 F.3d at 903. This reasoning extends naturally to the case at hand where it is alleged that the Officers placed Reiser's head underwater by putting pressure on his back while trying to handcuff him. Additional-

ly, this appears to me to be an instance in which a court decision is unnecessary to alert government officials that an action is unconstitutional. All reasonable officers should know that restraining a suspect in a position that forces his head under water for an extended period of time will, in almost every case, constitute excessive use force.

### 3. Sufficient Evidence

Lastly, I must determine whether Landis has offered sufficient evidence to indicate that what the Officers allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

### a. Use of a Police Baton

Landis has submitted evidence, notably the Autopsy Report of Werner U. Spitz, M.D.[1] and the statements of the Officers, supporting her contention that the Officers acted unreasonably in repeatedly striking Keiser with a police baton. Dr. Spitz's Autopsy Report makes special note of some of the bruising he observed on Reiser's body during the autopsy: "Two Parallel linear bruises approximately 3″ in length, 3/8″ apart with extensive underlying hemorrhage are noted on the back of the upper right thigh, and on the mid-front area of the right thigh (baton marks)."[2] Later in the report, Dr. Spitz states that "taser marks and evidence of baton strikes were noted on the body surface."[3]

In a report on Livingston County's internal investigation of the incident,[4] Deputy Baker stated that Officer Galareau struck Keiser with the baton ten times during the course of the arrest.

---

**1.** Exhibit S to Plaintiff's Response to Motion for Summary Judgment.

**2.** *Id.* at *1.

**3.** *Id.* at *3.

**4.** Exhibit M to Plaintiff's Response to Motion for Summary Judgment, *11.

816

Taken in the light most favorable to Landis, the evidence supports a finding that the Officers struck Keiser with a police baton ten times hard enough to cause severe bruising even though he was unarmed, surrounded by four officers, and no longer a threat to flee. This evidence raises a genuine issue of material fact over whether the Officers' use of the baton was objectively reasonable.

### b. Use of a Police Taser

Dr. Spitz's Report of Autopsy also notes that Keiser's body displayed signs of having been shocked with a police taser. "Paired taser injuries, total of five individual marks up to 1 1/4″ apart with surrounding read halo, are identified on the lateral upper left thigh area. Several of the markings show 1/8″ subcutaneous hemorrhage." [5] Dr. Spitz concludes his report with his opinion that "[t]he use of taser while immersed would have enhanced the drowning process." [6]

Landis has also submitted the Taser Data Log showing that on the morning of Keiser's arrest the taser used by the Officers was fired five times in a span of one minute and twenty-three seconds.[7]

Taken in the light most favorable to Landis, the evidence supports a finding that during the course of the arrest, the Officers shocked Keiser with a taser five times in less than a minute and a half and possibly shocked him while his head was submerged enhancing the drowning process that led to his death. This evidence raises genuine issues of material fact as to whether the Officers' use of the taser was objectively reasonable.

### c. Submergence of Keiser's Head

In his Autopsy Report, Dr. Spitz concluded that Keiser died as a result of drowning in muddy water.[8] The Officers have stated that Keiser was in a push-up position and his head went under the water when they attempted to pull his arms behind his back to place him in handcuffs.[9] Take in the light most favorable to Landis, the facts support a finding that the Officers' actions during the course of the arrest forced Keiser's head under the water causing him to drown. The evidence creates a genuine issue of material facts as to whether the Officers actions during Keiser's arrest in a water environment were objectively reasonable.

Because I have answered "yes" to each of the three parts of the qualified immunity inquiry, I hold that the Officers are not entitled to qualified immunity.

### C. Municipal Liability Under ¶ 1983

■■■ A local government may not be sued under § 1983 for injuries inflicted solely by its employees or agents. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipalities may, however, be found liable if the plaintiff establishes that the local government engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiffs constitutional rights. *Id.* at 690, 694, 98 S.Ct. 2018. Where a municipal-liability claim is premised on a local government's failure to act, the plaintiff must prove "(1) the existence of a clear and persistent pattern of violating federal rights ...; (2) notice or

5. Exhibits at *1.

6. *Id.* at *3.

7. Exhibit P to Plaintiff's Response to Motion for Summary Judgment

8. Exhibit S at *3.

9. Exhibit M at *8, 11, 12, and 16.

constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the moving force, or direct causal link for the constitutional deprivation." *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir.1996)(internal quotations omitted). "Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir.2005) (citing *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998)).

Landis alleges that Livingston County "(A) Failed to adequately screen, hire, train, and employ capable and professional deputies; (B) Failed to properly train its deputies in the proper, safe, utility of police equipment including but not limited to: police batons, pepper sprays, and tasers; and (C) Failed to adequately investigate and discipline repeated acts of misconduct of its professional deputies."[10] While this is a close issue in this case, I will continue to take this issue under advisement.

### D. Assault and Battery

 The Officers claim that they are entitled to summary judgment on Landis's state law assault and battery claim against them because they are shielded from liability by Michigan's Governmental Tort Liability Act[11] ("GTLA"). Under the GTLA, a government official whose actions are objectively reasonable under the circumstances is shielded from liability even if his actions would normally constitute intentional torts. *See Van Vorous v. Burmeister*, 262 Mich.App 467, 483, 687

N.W.2d 132 (2004). This issue, like the first part of the qualified immunity analysis, turns on whether the Officers' actions were objectively reasonable under the circumstances. For the same reasons already stated, I find that the evidence presents a genuine issue of material fact as to whether the officers actions were objectively reasonable under the circumstances presented by this case. I, therefore, find that summary judgment on this claim is inappropriate.

### IV. CONCLUSION

For the reasons set forth above, I DENY summary judgment to Officers Galarneau, Baker, and Lynch and take Livingston County's motion for summary judgment under advisement.

**IT IS SO ORDERED.**

---

**10.** Complaint, ¶ 19.

**11.** See M.C.L 691.1407(2).