**Wilson Ruiz ARROYO, Plaintiff,**

v.

**Joseph A. WALSH et al., Defendants.**

**Civ. A. No. 13100.**

United States District Court,
D. Connecticut.

July 8, 1970.

Burton M. Weinstein, Saltman, Weiss, Weinstein & Elson, Bridgeport, Conn., for plaintiff.

Frank Edward Babycos, Bridgeport, Conn., for defendants.

## MEMORANDUM OPINION AND ORDER

LUMBARD, Chief Judge:*

Wilson Ruiz Arroyo brings suit under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988 against Anthony Vida, John Lorenzo, Anthony Tom, Donald Murray and Robert Moore, police officers of Bridgeport; the Mayor of Bridgeport, the Superintendent of Police and six police commissioners of the City, charging them with violation of his civil rights. More specifically he alleges that when he was arrested on the night of September 18, 1968, after driving at 45 miles per hour through a stop sign and colliding with another car, Officers Vida and Lorenzo beat him with their fists and with a stick, breaking his nose and causing severe pain and suffering.

█ On all the evidence I must conclude that Vida and Lorenzo used excessive force and I direct entry of judgment against them in the sum of $2,500. See Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, 5 L.Ed.2d 492 (1961); Nesmith v. Alford, 318 F.2d 110 (5th Cir. 1963); Stringer v. Dilger, 313 F.2d 536 (10th Cir. 1963). As to the other defendants the complaint is dismissed. There has been no showing that the Mayor and the Police Superintendent improperly trained the police or acquiesced in the denial of Arroyo's civil rights. Nor does the complaint make sufficient allegation and showing to support the plaintiff's prayer, as a representative of Puerto Ricans in Bridgeport, that a receiver be appointed to process complaints regarding police treatment of Puerto Ricans. See Powell v. Workmen's Comp. Board, 327 F.2d 131 (2 Cir. 1964); Valley v. Maule, 297 F. Supp. 958 (D.Conn.1968).

█ It is now well established that local law enforcement officers who act under color of state law and who use excessive force in the enforcement of state laws are subject to civil liability under § 1983 as thereby they deprive those so injured of rights guaranteed by the Constitution and laws of the United States. See Monroe v. Pape, supra; Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); Hardwick v. Hurley, 289 F.2d 529 (7th Cir. 1961); Coleman v. Johnston, 247 F.2d 273 (7th Cir. 1957); Davis v. Turner, 197 F.2d 847 (5th Cir. 1952); Downie v. Powers, 193 F.2d 760 (10th Cir. 1951).

The undisputed facts show that about 9:00 P.M. on the evening of September 18, 1968, Arroyo was driving east on Crescent Street at a speed of 45 m. p. h. in his Chevrolet car although he had no license to drive. He failed to slow down when he came to the stop sign at the intersection of Pembroke Street and collided with a car which had just entered the intersection from Pembroke. Arroyo's car careened ahead at about 30 miles an hour until it came to a stop near a telephone pole 452 feet from the point of collision. Because of damage to the car, it could go no further. Vida and Lorenzo had been following Arroyo's car and when they drew up alongside they proceeded to arrest Arroyo. While the manner of Arroyo's leaving his car and

---

* Of the United States Court of Appeals for the Second Circuit, sitting by designation.

his conduct immediately thereafter is in dispute, it is agreed that Arroyo was subdued, handcuffed and placed in the rear seat of the police car. The police called for an ambulance and then returned to the scene of the collision. Arroyo was then placed in the ambulance and taken to the Bridgeport Hospital where he was x-rayed and the doctor in attendance found that Arroyo had a comminuted fracture of the nose, the bone having been shattered into many little sharp pieces, and five stitches were needed to close the wound.

The officers filed charges against Arroyo for resisting arrest, Conn.G.S. § 53–165; evading responsibility, Conn.G.S. § 14–224; running through a stop sign, Conn.G.S. § 14–301; driving without a license, Conn.G.S. § 14–36(a); and driving with faulty equipment, Conn.G.S. § 14–80. He was released on $450 bail sometime in the morning. Some months later, on February 13, 1969, apparently because the police or the city counsel failed to supply particulars in response to a motion made by Arroyo's attorney, the charges were dismissed. In view of Arroyo's admission that he was driving in excess of the speed limit, that he had no license to drive and that he failed to stop at the stop sign, the failure to supply particulars and prosecute the charges seems incomprehensible. Within a few days after the charges had been dismissed, Arroyo gave the City Clerk of Bridgeport a Notice of Intention to bring an action, and this action was commenced on April 23, 1969.

The testimony of Arroyo and that of a bystander, Johnny Garcia, differs sharply from that given by Vida and Lorenzo regarding Arroyo's treatment by the two police officers. Arroyo, who was 19 years old at the time of the accident, came to the United States from Puerto Rico in April 1967 and lived with his grandmother and his uncle in September 1968. He testified through an interpreter as it was apparent that his understanding of English was still somewhat limited at the time of trial in May 1970. Arroyo concedes that on the evening of September 18 he was driving about 45 m. p. h. on Crescent Street. As he came to the stop sign at the intersection of Pembroke Street he put his foot on the brake but the car did not stop; he then collided with James Brasiel's car in the middle of the intersection. Arroyo said he was not injured by the crash into Brasiel's car; he did not have the seat belt on, and the windshield was not broken. His car veered but kept going on Crescent Street until it came to a stop against a pole near the curb. At that point the car could no longer be driven.

Although he had no wounds and was not bleeding, Arroyo felt dizzy. The two policemen came alongside and took him out of the car. They beat him with their fists and broke his watch. They handcuffed his hands behind his back, took him by the hair and smashed his face against the glass of the back window of his car, and then put him in the police car. The driver of the car, whom Arroyo identified as Vida, hit him on the nose with a short club and said "I feel like killing you as though you were a dog." By this time Arroyo was bleeding from his face and nose. Almost immediately after he was taken back to the intersection an ambulance arrived and he was taken to the hospital where he was x-rayed and five stitches were taken in his nose.

Johnny Garcia, a disinterested bystander, supported Arroyo's account of his treatment by Vida and Lorenzo. Garcia, who was 16 at the time, also testified through an interpreter. He saw the cars hit and he then ran after Arroyo's car. Vida and Lorenzo were already there when he got to Arroyo's car which had stopped when it hit the pole. He testified that they got out of their car, opened the door of Arroyo's car and took him out "like a dog;" they beat him with their fists, kicked him many times, handcuffed him and threw him in the back of their car. One of the police said to him "I feel like killing you, you ----ing Puerto Rican" and swung at him with something. Arroyo's face

"looked like a Roman candle" and he was "bleeding all over the place." After the police left with Arroyo, Garcia looked at Arroyo's car and saw no blood in the car. Garcia had not known Arroyo but someone at the scene told him where Arroyo lived and he went there and saw Arroyo's uncle whom he did know.

Lorenzo and Vida gave quite a different version of Arroyo's arrest. Lorenzo, who had been on the force for eleven months, testified that he was riding with Vida in a police car, just in back of Arroyo's car, at it went at 45 to 50 m. p. h. and failed to stop or slow down at the Crescent Street stop sign. They saw the collision and followed Arroyo as his car came to a stop near the curb. Lorenzo got out, ran to Arroyo's car and asked him for his driver's license. Arroyo, who "was just sitting there," seemed dazed. Then Arroyo, who was bleeding, swung open the car door which hit Lorenzo in the chest, knocking him down. Arroyo tried to get away but Lorenzo and Vida subdued him, put him over the trunk of his car and handcuffed him. Arroyo's face was bleeding and there was blood on the windshield. They did not strike or kick Arroyo. They placed him on the back seat of the police car. Vida used the radio phone and asked for an ambulance and they drove back to the intersection where Lorenzo got into another police car and went to Bridgeport Hospital for treatment of a sprained ankle. In the casualty report made out on September 18, 1969 at 10:40 P.M. it was noted that Lorenzo "received injuries in the scuffle." Lorenzo said that the steering wheel of Arroyo's car looked "pushed up forward" and there was a cob-web like crack in his windshield. Lorenzo saw blood on the windshield and steering wheel. Lorenzo's accident report made no mention of these facts nor did he report Arroyo's injury.

Vida testified that he was driving the police car. Lorenzo was the first out of the police car, and as he approached Arroyo's car, Arroyo slammed the door into him and tried to get away. Lorenzo fell on his side, breaking his fall with his right hand injuring his knuckles and twisting his ankle. Vida is 6' 2", weighs 215 pounds, plays semi-pro football and is a weight lifter. Arroyo is slightly built and considerably shorter. Vida said that Arroyo ran into him and he used a bear hug to subdue Arroyo. Vida then put handcuffs on Arroyo. During the scuffle, Vida got blood on his hands but not on his clothes. Vida testified he did not see Arroyo strike any part of his body in the collision but he did see a break in Arroyo's windshield directly over the steering wheel which was bent; further he testified there was blood on the steering wheel and inside the windshield. Vida, like Lorenzo, made no mention of these factors in his report of September 18. Vida also testified that Lorenzo had a night stick but that he himself did not carry one.

Police officer Robert Moore who came to investigate said he remembered a hair line crack on the windshield of Arroyo's car, blood on the steering wheel and he thought there was some blood on the windshield. Sergeant Murray also remembered that Arroyo's windshield was cracked and shattered. No police record made at the time contained any reference to the condition of Arroyo's car. The first time the condition is reported is in the reports made in March and April 1969, by Vida and Lorenzo, at the request of Inspector Lealy and Captains Bergers and McPadden of the Bridgeport Police Department, after this suit had been brought.

■ From the demeanor of the witnesses and the evidence given, I credit the testimony of Arroyo and Garcia that Arroyo's nose was broken by a blow from Lorenzo's night stick wielded by Vida. It is quite understandable that Vida and Lorenzo thought they might have trouble subduing Arroyo who had just driven through a stop sign, collided with another car and proceeded ahead for 150 yards before stopping. Although the defense of good faith and probable cause is available to the defendants under 42 U.S.C. § 1983, Pierson v. Ray, 386 U.S. 547, 87

S.Ct. 1213, 18 L.Ed.2d 288 (1967), I find their arguments unpersuasive on this record. It is hard to believe that Arroyo, in a dazed and shaken condition from the collision, could have tried to flee or resist two police officers. Indeed, if one credits the defendants' theory that Arroyo's nose was already broken as a result of the collision, the testimony of Vida and Lorenzo seems all the more unlikely. Moreover, it does not seem probable that Arroyo's nose was broken as a result of the collision with Brasiel's car as he showed no signs of any other face injuries when examined by the doctor. Whatever scuffle may have taken place and whatever resistance Arroyo may have offered, I must conclude that the officers used force well in excess of what was reasonably required. Moreover, there was no need to use any force once he was handcuffed and placed in the police car. The use of excessive force and the blow from the night stick, for all of which both Vida and Lorenzo must be held responsible, was a violation of Arroyo's civil rights.

Although counsel for Arroyo has requested that counsel fees be awarded, the court is not disposed to award counsel fees in a case which is essentially a simple tort action arising from a single incident affecting but one person. See Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156 (9th Cir. 1966), aff'd 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Williams v. Kimbrough, 295 F.Supp. 578 (D.La.1969). Those cases which counsel cites do not support his position as they are cases of long and continuous discrimination involving considerable numbers of people. The request for counsel fees is therefore denied.

In sum, I find that Arroyo has shown that his civil rights were violated by the unnecessary use of excessive force by Vida and Lorenzo, Monroe v. Pape, supra. Arroyo, who was earning approximately $165 per week, lost eight days of work as a direct result of the injuries sustained in the incident. He also paid a total of $12 in doctor bills for two visits to a doctor. As compensation for his lost wages, doctor bills and pain and suffering he should have judgment in the sum of $2,500. See Rhoades v. Horvat, 270 F.Supp. 307 (D.Colo.1967); McArthur v. Pennington, 253 F.Supp. 420 (E.D.Tenn.1963); Antelope v. George, 211 F.Supp. 657 (D.Idaho 1962).

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion constitutes the court's findings of fact and conclusions of law.

The Clerk is directed to enter judgment in favor of the plaintiff and against defendants Vida and Lorenzo, and dismissing the complaint as to all other defendants.