719 S.E.2d 863

CITY OF SAINT ALBANS, A West Virginia Municipal Corporation and B.L. Tagayun and A.C. Truitt, Defendants Below, Petitioners

v.

David A. BOTKINS, Plaintiff Below, Respondent.

No. 101596.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 28, 2011.

Decided Nov. 23, 2011.

394

Duane J. Ruggier, II, David A. Holtzapfel, Pullin, Fowler, Flanagan, Brown & Poe, Charleston, WV, for Petitioners.

Michael T. Clifford, Law Office of Michael T. Clifford, Charleston, WV, for Respondent.

McHUGH, Justice:

In this interlocutory appeal of the November 5, 2010, order of the Circuit Court of Kanawha County,[1] the defendants below—the City of Saint Albans, B.L. Tagayun and A.C. Truitt[2] (hereinafter collectively referred to as "Appellants")—challenge the trial court's refusal to grant summary judgment on qualified immunity grounds. The underlying civil complaint filed by David A. Botkins (hereinafter "Mr. Botkins" or "Appellee") included the allegation that his civil rights had been violated due to the use of excessive force by municipal law enforcement officers. In response, Appellants raised the defense of qualified immunity in a motion for summary judgment.

Appellants contend that the lower court applied an incorrect standard in its qualified immunity analysis and improperly denied its motion for summary judgment on this ground. They also maintain that the lower court erred by not ruling on the other grounds they raised in support of summary judgment.[3] After careful review of the record, due consideration of the arguments raised by the parties, and close examination of the applicable law, the denial of summary judgment is reversed on qualified immunity grounds for the reasons stated in this opinion.

## I. Factual and Procedural Background

The incident giving rise to the underlying civil complaint involved a confrontation between Mr. Botkins and the Saint Albans police on November 23, 2008. Two municipal law enforcement officers were involved, one being a paid police officer, Mr. Tagayun, and the other being a reserve (volunteer) officer, Mr. Truitt. According to the affidavit of Mr. Truitt in the record, the two officers were on foot patrol in an area near a Taco Bell in Saint Albans around 3 a.m. on November 23, 2008, when they heard shouting coming from the proximity of the drive-thru lane of the restaurant. At the same time they saw a male running from the main parking lot of the Taco Bell to the drive-thru area. The officers crossed the street to investigate and observed three males outside of a Jeep Cherokee holding items which could have been used as weapons. One of the males had a long-handled Mag-lite flashlight, a second had a small bat, the third (Mr. Botkins) did not have anything in his hands but did have a cast on his right arm. These three males

---

1. The underlying civil action was assigned to Judge James C. Stuckey. However, the summary ruling in question was made by Senior Status Judge John S. Hrko who was sitting by temporary assignment.

2. The complaint initiating the civil suit indicates that Mr. Tagayun and Mr. Truitt were being sued in their capacity as municipal law enforcement officers, with Mr. Tagayun also being sued in his individual capacity.

3. The second assignment of error specifically states the lower court "erred when it denied the City of St. Albans, B.L. Tagayun, and A.C. Truitt's *Motion for Summary Judgment* because the Court did not, in fact, rule upon the other arguments proffered with the Defendants' *Motion for Summary Judgment.*" These alternative grounds as set forth in Appellants' brief include arguments regarding statutory immunity applicable to the City of Saint Albans, statutory immunity applicable to Mr. Tagayun and Mr. Truitt individually, and insufficient evidence to support the claim of emotional distress.

were in what appeared to be a confrontational posture facing three other males who were standing empty handed outside of a pickup truck.

Appellee's explanation of the facts of what occurred on November 23, 2008, appear in his deposition contained in the record. He testified that one of the two male companions with him in his Jeep Cherokee that morning began shouting obscenities at the occupants of a truck ahead of them in line at the drive-thru because the driver of the truck was slow in moving forward to close a gap in the line. The three male occupants of the truck exited the vehicle and approached the Jeep.[4] Appellee and the two males with him exited the Jeep. While Appellee did not have anything in his hands when he got out of the Jeep, one of his companions had a flashlight[5] in his hand and the other had a wooden club.[6] Appellee said that because of the cast on his arm he positioned himself so that his friends were between him and the three males approaching from the truck. As the six males faced off shouting obscenities at each other, one of Appellee's passengers recognized a passenger of the truck as someone he knew, causing the confrontation to abate. Appellee testified in his deposition that the change from an argumentative showdown to a calmer exchange between the six males occurred "about that time" Officers Tagayun and Truitt arrived on the scene. Portions of the depositions in the record of three other young males involved in the encounter corroborated this observation.

When the officers approached the group, Officer Tagayun ordered the group to get down on the ground and all but Mr. Botkins

complied fully with the order. In his deposition testimony, Appellee said that when Officer Tagayun saw him on his knees the officer ran up to him, and threw Appellee's hands up behind his back while kneeing him in the back. Appellee said that Officer Tagayun then hit him in the head with the butt of his drawn gun. He further said that while the officer proceeded to hit him twice more with the butt of the gun and repeatedly kicked him he yelled: "That's police brutality. I didn't do nothing wrong. Why did you hit me?" Appellee was subsequently handcuffed and placed in shackles, which were removed when the ambulance arrived to attend to Mr. Botkins' head wounds.[7]

Based upon this incident, Mr. Botkins filed a complaint initiating a civil suit against the city and the officers on August 6, 2009. Mr. Botkins's complaint alleged various grounds including "constitutional tort action" for violation of federal and state constitutional rights,[8] vicarious liability and negligent hiring on the part of the city, battery and intentional infliction of mental, physical and emotional distress by the officers, and false arrest/malicious prosecution directed solely at Mr. Tagayun for "maliciously and falsely obtain[ing] warrants for the arrest of the plaintiff."

On August 11, 2010, Appellants moved for summary judgment asserting immunity from suit both on qualified immunity and statutory immunity grounds. They maintained that qualified immunity was applicable because the individual actions of the officers were not "clearly unlawful" as defined by the United States Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272

---

4. The driver of the truck was deposed and he testified that after his two companions got out of the truck to head toward the Jeep, he moved the truck to the front parking lot of the eatery. He went on to explain that he ran back to join his companions in the area of the drive-thru because he had recognized one of the passengers of the Jeep and hoped to ward off a possible fight between the two groups.

5. The Appellee agreed during the deposition that the flashlight was a large Mag-lite flashlight.

6. Later in the deposition Appellee described the club as a short baseball bat he had made at work and had left in his Jeep.

7. The complaint states that Mr. Botkins was transported to a hospital for treatment which included the application of seven staples to one head wound and three to another.

8. The complaint alleges violations of "Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution which incorporates the constitutional rights guaranteed to plaintiff under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." As presented, the "constitutional tort" claim would be a civil rights action under the provisions of 42 U.S.C. § 1983 (1996).

(2001). It was stressed that Mr. Truitt was acting in the capacity of a volunteer officer, did not cause injury to Mr. Botkins and he had no duty to intervene. Two arguments were made with regard to statutory immunity under the state's Governmental Tort Claims and Insurance Reform Act:[9] (1) the City of Saint Albans was immune from common law claims for any intentional act of its employees;[10] and (2) the individuals were immune from the claims because they were acting within the scope of their authority and without evidence of malice, bad faith or recklessness.[11]

The transcript of the November 4, 2010, hearing on the summary judgment motion reflects that the circuit court primarily addressed the qualified immunity argument, although brief consideration was given to the contention that Mr. Truitt as a reserve/volunteer officer had no duty to intervene.[12] The circuit court denied the motion for summary judgment concluding that the case would be better decided on a motion for a directed verdict. Defense counsel, focusing on Mr. Truitt's involvement, restated that the U.S. Supreme Court's standard in *Saucier* required a finding that the actions of the reserve officer were "clearly unlawful" in order to defeat the defense of qualified immunity. The trial court repeated its ruling that a motion for a directed verdict would be the best time to make that decision even for qualified immunity purposes. The subsequent order entered on November 5, 2010, simply indicates that summary judgment was denied "for reason stated on the record."

Appeal of the denial of summary judgment was filed with this Court on December 23, 2010.

## II. Standard of Review

An order denying a motion for summary judgment is interlocutory and is generally not appealable except in special instances. Syl. Pt. 8, *Aetna Casualty & Surety Co.*, 148 W.Va. 160, 133 S.E.2d 770 (1963). This Court has specifically recognized that "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009). The Court observed in *Robinson* that allowing interlocutory appeal of a qualified immunity ruling is the only way to preserve the intended goal of an immunity ruling: to afford public officers more than a defense to liability by providing them with "the right not to be subject to the burden of trial." *Id.* at 833, 679 S.E.2d at 665 (citation omitted). Therefore, while it is appropriate to proceed with this appeal, our review is limited to the sole issue of qualified immunity.[13]

The standard of review applied in these special instances is stated in syllabus point one of *Findley v. State Farm Mutual Automobile Insurance Company*, 213 W.Va. 80, 576 S.E.2d 807 (2002): "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Likewise, the review undertaken follows the general principle applicable to any summary judgment ruling: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the

---

9. W.Va.Code §§ 29–12A–1 through 18.

10. *See* W.Va.Code § 29–12A–4(c)(2) (1986) (political subdivision liability extends only to negligent acts of employees acting within the scope of employment).

11. *See* W.Va.Code § 29–12A–5(b)(1–3) (1986) (providing immunity to political subdivision employees unless their actions or omissions are manifestly outside the scope of official responsibilities, or involve a malicious purpose, bad faith or recklessness, or liability is expressly imposed by statute).

12. As no record had yet been developed in this case regarding the legal parameters surrounding the position or authority of a reserve/volunteer officer, it is beyond the scope of our consideration in this appeal.

13. In cases where interlocutory review of qualified immunity determinations occurs, any summary judgment rulings on grounds other than immunity are reserved for review at the appropriate time should the interlocutory appeal result in finding immunity inapplicable under the circumstances.

law." Syl. Pt. 3, *Aetna Casualty & Surety Co.*, 148 W.Va. at 160, 133 S.E.2d at 771.

## III. Discussion

Appellants maintain that the lower court applied an incorrect standard in denying the motion for summary judgment on qualified immunity grounds. Identifying the proper standard is the foundation of our discussion.

■ Our approach to matters concerning immunity historically has followed federal law due in large part to the need for a uniform standard when, as in the case before us, public officers are sued in state court for violations of federal civil rights pursuant to 42 U.S.C. § 1983. *Robinson* at 834, 679 S.E.2d at 666. Our general immunity standard was adopted in *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465 (1987), *overruled in part, State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992), a case involving a 42 U.S.C. § 1983 action against police officers for entering a private residence without an arrest warrant and placing the occupant under arrest. The matter proceeded to trial and at the end of the plaintiff's case, the trial court directed the verdict for the police officers and the plaintiff appealed. In affirming the lower court, this Court examined federal cases involving entitlement to qualified immunity. In reliance on language contained in two U.S. Supreme Court cases,[14] this Court formulated the following qualified immunity standard as the sole syllabus point in *Bennett*:

> Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does.[15]

■ The Court had occasion to further examine the contours of qualified immunity in *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996). In *Hutchison*, a land owner brought a § 1983 civil rights claim against the city for refusing to issue a building permit. The city maintained on appeal that even the complaint had failed to sufficiently establish any violation on which relief could be premised. Acknowledging that this issue was lost because the action had proceeded beyond pleading, the Court nonetheless proceeded to provide guidance in accord with the U.S. Supreme Court's position that there be early resolution of cases in which the defense of immunity is raised. *Id.* at 147, 479 S.E.2d at 657. Particular emphasis was placed on the holding in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), that qualified immunity, as an entitlement not to stand trial in certain circumstances, "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526, 105 S.Ct. 2806 (emphasis in original). This reasoning underlies the following holding in syllabus point one of *Hutchison:*

> The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

The Court in *Hutchison* further observed that the general test as announced in *Bennett* had been refined in *State v. Chase Securities, Inc.*, making it clear that immunity does not extend to fraudulent, malicious or otherwise oppressive acts of public officials. The Court concluded in *Hutchison* that the question to determine entitlement to qualified immunity in the absence of such wrong-

---

14. *See Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

15. In *Chase Securities*, the *Bennett* holding was found to be overbroad and was clarified as only applying to qualified immunity and not absolute immunity. 188 W.Va. at 361–62 n. 14, 424 S.E.2d at 596–97 n. 14.

doing centers on "whether an objectively reasonable official, situated similarly to the defendant, could have believed that his conduct did not violate the plaintiff's constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct[.]" 198 W.Va. at 149, 479 S.E.2d at 659. Thereafter, the elements of the standard announced in *Bennett* were separated into the following two inquiries:

(1) does the alleged conduct set out a constitutional or statutory violation, and

(2) were the constitutional standards clearly established at the time in question?

*Id.* Further elaboration of this two-part inquiry appears in *Hutchison* as follows:

The threshold inquiry is, assuming that the plaintiff's assertions of facts are true, whether any allegedly violated right was clearly established. To prove that a clearly established right has been infringed upon, a plaintiff must do more than allege that an abstract right has been violated. Instead, the plaintiff must make a "particularized showing" that a "reasonable official would understand that what he is doing violated that right" or that "in the light of preexisting law the unlawfulness" of the action was "apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Indeed, some courts hold that an "official may not be charged with knowledge that his or her conduct was unlawful unless it has been previously identified as such." *Warner v. Graham,* 845 F.2d 179, 182 (8th Cir.1988). But, for a right to be clearly established, it is not necessary that the very actions in question previously have been held unlawful. *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039.

*Id.* at n. 11.

While considering a Ninth Circuit case relative to a civil rights claim based on excessive use of force, the U.S. Supreme Court expounded on the application of the two-part inquiry recognized above in *Hutchison* rele-

vant to qualified immunity in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), *see* n. 17, *infra.* The *Saucier* case was filed by a demonstrator who was arrested by military police after the demonstrator attempted to unfurl a banner at a public event where the U.S. Vice President was speaking. The suit alleged that the arrest involved excessive use of force by the officers in violation of his Fourth Amendment rights. The officers raised the defense of qualified immunity and moved for summary judgment. The district court denied the motion, finding a dispute of a material fact remained as to whether excessive force was used by the officer removing the demonstrator from the crowd. The Ninth Circuit affirmed, summarily finding that the first step of the qualified immunity test was satisfied, that is, the facts alleged demonstrated a constitutional violation. As to the second step of the qualified immunity inquiry— whether the constitutional standards were clearly established at the time in question— the Ninth Circuit concluded it should be answered by applying the same test the U.S. Supreme Court set forth in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) [16] for assessing whether excessive force was reasonable under the circumstances in suits claiming excessive use of force by police officers.

The U.S. Supreme Court ruled in *Saucier* that the two matters are completely distinct, serve different purposes and are analyzed under separate, established standards. As discussed in *Saucier,* excessive force claims are tested under objective standards of reasonableness as set forth in *Graham v. Connor.* This test does not conflict with or overshadow the distinctly different test which applies to qualified immunity matters initially established in *Harlow v. Fitzgerald* and later refined in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), and *Siegert v. Gilley,* 500 U.S. 226,

---

**16.** The objective test for excessive force claims as stated in *Graham* is:

"[W]hether the officers' actions are 'objectively reasonable' in light of the facts and circum-

stances confronting them, without regard to their underlying intent or motivation."

490 U.S. at 397, 109 S.Ct. 1865.

111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), and adopted by this Court in *Hutchison*. The Court in *Saucier* fashioned the following two-prong test that a court required to rule on the qualified immunity issue must consider:

> (1) Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?
>
> (2) If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established[, that is] it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

533 U.S. at 201–202, 121 S.Ct. 2151.[17] The Court in *Saucier* went on to explain that qualified immunity should operate "to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." 533 U.S. at 206, 121 S.Ct. 2151 (internal citation omitted). Any inquiry relative to the reasonableness of the force used under the circumstances is of no moment to the trial court when deciding the question of qualified immunity. When the qualified immunity defense is raised in cases based on use of excessive force and the facts as alleged represent a constitutional violation, the pivotal inquiry becomes whether the officers were on notice that their conduct was unlawful.

■ Although decided in the context of an excessive force claim, the *Saucier* test applies equally to any case grounded on a § 1983 civil rights claim in which public officers raise a qualified immunity defense. The test set forth in *Saucier* furnishes added guidance on the analysis of the relevant factors a trial court must consider to determine whether public officers are entitled to be "shielded from liability for civil damages"

due to qualified immunity. *Bennett*, 178 W.Va. at 500, 361 S.E.2d at 465. It also is in keeping with the guidance the Court previously provided in *Hutchison* regarding the two-part inquiry inherent in qualified immunity determinations. Accordingly, we hold that a public officer is entitled to qualified immunity from civil damages for performance of discretionary functions where: (1) a trial court finds the alleged facts, taken in the light most favorable to the party asserting injury, do not demonstrate that the officer's conduct violated a constitutional right; or (2) a trial court finds that the submissions of the parties could establish the officer's conduct violated a constitutional right but further finds that it would be clear to any reasonable officer that such conduct was lawful in the situation confronted. Whenever the public officer's conduct appears to infringe on constitutional protections, the lower court must consider both whether the officer's conduct violated a constitutional right as well as whether the officer's conduct was unlawful. Pursuant to our holding in *Hutchison*, unless there is a bona fide dispute as to predicate facts concerning these fundamental qualified immunity elements, the ultimate determination of immunity is a question of law which is ripe for summary disposition before trial because qualified immunity affords immunity from suit rather than just a defense to liability. 198 W.Va. at 149, 479 S.E.2d at 659.[18] Being subject to interlocutory appeal, a trial court's pretrial ruling involving the existence of qualified immunity must clearly set out factual findings sufficient to permit meaningful appellate review of the issues herein identified. *Compare Syl. Pt. 3, Fayette County National Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997) ("[A] circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Find-

---

**17.** The test as announced in *Saucier* required rigid adherence to the order in which the two-step analysis be conducted. Thus if the facts did not reveal a constitutional violation, then immunity applied. That mandate was overruled in the later case of *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), leaving the order of consideration of the two relevant inquiries up to the discretion of the trial courts.

**18.** *Hutchison* provides the further instruction that "it is the jury, not the judge, who must decide the disputed ... facts that underlie the immunity determination, but it is solely the prerogative of the court to make the ultimate legal conclusion." *Id.*

ings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.").

Turning to the case at hand, the trial court's order denying summary judgment contained a cursory ruling that "Upon viewing the facts in the light most favorable to the Plaintiff, and for reasons stated on the record, the Motion for Summary Judgment is hereby DENIED." Review of the ruling may nonetheless proceed because the record contains the transcript of the November 4, 2010, hearing on the motion for summary judgment reflecting the lower court's essential reason for denying the motion. The lower court's ruling from the bench is as follows:

> You know, the mere fact that a police officer strikes somebody doesn't necessarily cause me to condemn them. I mean, that's better than shooting them.

> We're not dealing with—These places at night aren't tea parties. These places are tough, and you take it down, and you resolve the problem, and you sort it out later. Just about every police officer that I know has been sued.

> And there was—At least at some point in time there that night, there was a problem. It was resolved, and now we have a lawsuit over it.

> You have a right to resist an unlawful arrest. If someone comes up here and tells me to lay down on the floor, I can lay down on the floor, or I can stand up.

> If I cower and lay down on the floor, I'm all right. If I take the position that, "You don't have the right to tell me to do that," I can expect a busted nose.

> But the question is, "Is it reasonable that my nose got busted?" I don't know.

\* \* \*

> Now, that opens the door to, "Is it wrong? Was a wrong being committed? Did it—Was it—Should he have his head whacked with a pistol?" Probably not.

> Was it wrong to do it? I don't know. . . .

> Is there qualified immunity? Well, then I have to decide whether or not I believe that the act was a wrongful act, and I don't know. . . . I believe that reasonable minds could come to different conclusions about each and every issue that you have raised in this case.

> I believe that this is one of those cases that should better be decided on a motion for a directed verdict, as opposed to a motion for summary judgment, and, accordingly, your motion that for summary judgment will be denied on each of the grounds you have cited in your brief.

■ It is far from clear what facts the lower court relied upon to determine that the officer's conduct violated a constitutional right. Nor has our review of the record revealed any disputed predicate facts regarding this factor. There is no dispute that the meeting of the young men in the two vehicles initially was confrontational and included shouting and cursing between the two groups. It is also uncontested that the incident occurred at 3 a.m. at the drive-thru of a restaurant which was open and serving food to the public. Likewise, there is no question that the officers saw someone running toward what appeared to be a fracas, and that two of the six males were carrying objects that could serve as weapons. Moreover, there is no dispute that the officers arrived at the scene—as the Appellee testified—"about that time" the hostility between the two groups was abating. Thus the facts support that the officers' investigation of the incident was warranted,[19] and Appellee has demonstrated no constitutional basis for failing to comply with the investigation. Nevertheless, the lower court could have assumed that a violation of a constitutional protection was implicated solely because force was used by a public officer. The *Saucier* Court deduced the same by stating that a constitutional violation "*could have occurred* under the facts alleged based simply on the general rule prohibiting excessive force." 533 U.S. at

---

19. *See* W.Va.Code § 8–14–3 (1990) (mandatory duty of municipal law-enforcement officers to enforce the criminal laws of the state within the municipality; failure to discharge duty subjects officer to removal for official misconduct).

207, 121 S.Ct. 2151 (emphasis added). This leads to the second inquiry, not undertaken by the lower court at the hearing, of whether in this case the general prohibition against excessive force was contravened by the circumstances the officers faced.

The circumstances confronted in the present case provide adequate grounds for the a reasonable law-enforcement officer to have believed that use of force was justified in performance of his duties. A reasonable officer in the same situation—arriving at the scene of what appeared to be a hostile confrontation of six young men who were yelling and cursing at one another in a public area with two of the young men visibly carrying objects which could serve as weapons—could have believed a crime was in progress or about to be committed and deduced that steps needed to be taken to diffuse the situation. Ordering the group to the ground appears to be an appropriate law-enforcement effort to gain control of such an uncertain situation. Once Appellee refused to comply, a reasonable officer may have believed the refusal to be an attempt to obstruct the officer from performing an investigation to determine whether any criminal activity was involved.[20] Moreover, using force as the method to obtain compliance with the order to lie flat on the ground so that the situation could be fairly assessed by law enforcement was not unreasonable in the circumstances confronted.[21]

The officer insisting on compliance with his order to get on the ground would not have known the extent of the threat imposed by the group, whether there were others outside of the group who would pose a larger threat to securing the situation, or how much of a risk the group posed to the public, including those in line at the drive-thru and those working in the restaurant. It goes without saying that the officers' own safety may have been at stake. Under these circumstances, a reasonable officer may have determined that force was necessary. As the U.S. Supreme Court recognized in *Graham v. Connor*, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." 490 U.S. at 396, 109 S.Ct. 1865. Significantly, we know of no basis—and Appellee points to none—on which to conclude that a reasonable officer would be on notice under these circumstances that the conduct complained of was unlawful. Moreover, a contrary conclusion would leave law-enforcement officers acting at their peril in such uncertain situations where quick action is often required. As the Fourth Circuit recognized in *Maciariello v. Sumner*, 973 F.2d 295 (1992), qualified immunity should serve to shield law enforcement officers from "bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* at 298. No bright lines exist in this case.

Based upon our analysis, there is no dispute with regard to any of the facts relevant to the qualified immunity determination which would warrant support for the lower court's position to forego deciding the immunity issue at the summary judgment stage.[22] Our review of the facts and circumstances in the record support finding qualified immunity from suit, either because no constitutional violation is established by the facts alleged or because a reasonable officer confronting the same situation—without notice to the contrary—would have considered the action lawful. Consequently, the order of the lower court is reversed. Given the limited scope of this interlocutory appeal on the sole issue of qualified immunity, the case is remanded for any proceedings which may be needed to address any issues not dealing with qualified immunity.

---

**20.** *See* W.Va.Code § 61–5–17 (1923) (providing the criminal offense of obstructing a law-enforcement officer).

**21.** Although Appellee had a soft cast on his arm, it was not alleged that the cast would have interfered with his ability to fully comply with the officer's directive.

**22.** Although our decision makes it unnecessary to reach the second argument raised in this appeal, circuit court orders relative to dispositive motions should adequately address all reasons underlying the decision reached in order to preserve the matters for appellate review.

## IV. Conclusion

For the foregoing reasons, the November 5, 2010, order denying summary judgment is reversed, and the case is remanded for any further proceedings which may be required regarding matters to which qualified immunity may not extend.

Reversed and remanded.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

BENJAMIN, Justice, dissenting:

It is *not* constitutionally permissible for a police officer to severely injure a helpless, physically disabled, unarmed citizen who is on his knees with his arms held up over his head by viciously pistol whipping him and kicking him.[1] No West Virginia citizen should ever be brutalized by a law enforcement officer acting under the color of state authority in the way Mr. Botkins allegedly was. For decades, it has been universally established in the jurisprudence of this country that the type and degree of clearly excessive force used against David Botkins by Officer B.L. Tagayun in this case is unconstitutional. Mr. Botkins was not fleeing. He had no weapons. He was not acting in a provocative manner. He was no threat to the investigating officers. He was submissive and was attempting to surrender in a manner which protected his broken arm which was in a cast-something evident to anyone observing. It is shocking that despite having done nothing wrong, Mr. Botkins is now left without recourse by the majority's opinion.[2]

Officer Tagayun is not entitled to qualified immunity. His conduct toward Mr. Bodkins was objectively deplorable, excessive, severe and unnecessary. The impropriety of the type of actions he committed has been "clearly established" for decades in our country.[3]

---

1. In Mr. Botkins' complaint, it is asserted that after the pistol-whipping and kicking, which was confirmed by other witnesses, Officer Tagayun spat upon him. In reviewing the record, I did not again see reference to a "spitting" incident. I cannot conceive of there ever being propriety in a police officer spitting on a citizen, especially when the citizen is already restrained. Although a police officer's patience may be greatly challenged by the conduct of disorderly individuals, the act of spitting and the contempt towards another which the act necessarily communicates is absolutely unacceptable. When done by a law enforcement officer it implies an "official" contempt even if done only out of personal frustration. More ominously though, here, it conveys another message. If true, it tells us that Officer Tagayun was not acting reasonably to "control" Mr. Botkins, but rather that he was acting upon emotion and he was exacting a punishment on Mr. Botkins for not "properly" submitting to him.

2. This action concerns allegation of violations of civil rights by a governmental actor. On appeal, this Court is bound to accept as true the allegations of fact in the light most favorable to Mr. Botkins. By virtue of this being an action claiming excessive force by a law enforcement officer in his official state capacity, Officer Tagayun will now not have the opportunity in a trial to explain his side of the story. Conversely, civil rights cases are important to the very essence of our society. Where appropriate, it is a good thing for such cases to be reviewed by citizens sitting on juries.

3. The majority is simply incorrect on the issue of whether it is "clearly established" that pistol-whipping a surrendering suspect under these circumstances is improper. The following cases are just a portion of those which have established that, absent something far worse than was present herein, the beating of a surrendering suspect with a pistol or other instrument such as a flashlight, a nightstick, a blackjack, is improper under the circumstances present herein: *Sanchez v. Hialeah Police Dept.*, 357 Fed.Appx. 229 (11th Cir.2009); *Landis v. Baker*, 297 Fed.Appx. 453 (6th Cir.2008); *Green v. New Jersey State Police*, 246 Fed.Appx. 158 (3rd Cir.2007); *Sallenger v. Oakes*, 473 F.3d 731 (7th Cir.2007); *Baker v. City of Hamilton, Ohio*, 471 F.3d 601 (6th Cir.2006); *Walker v. City of Riviera Beach*, 212 Fed.Appx. 835 (11th Cir.2006); *Baltimore v. City of Albany, Ga.*, 183 Fed.Appx. 891 (11th Cir.2006); *Spann v. Rainey*, 987 F.2d 1110 (5th Cir.1993); *Murphy v. Lancaster*, 960 F.2d 746 (8th Cir.1992); *Dixon v. Richer*, 922 F.2d 1456 (10th Cir.1991); *Lewis v. Downs*, 774 F.2d 711 (6th Cir.1985); *Linn v. Garcia*, 531 F.2d 855 (8th Cir.1976); *Basista v. Weir*, 340 F.2d 74 (3rd Cir.1965); *Morgan v. Labiak*, 368 F.2d 338 (10th Cir.1966); *Stringer v. Dilger*, 313 F.2d 536 (10th Cir.1963); *Kies ex rel. Kies v. City of Lima, Ohio*, 612 F.Supp.2d 888 (N.D.Ohio 2009); *Hudson v. District of Columbia*, 517 F.Supp.2d 40 (D.D.C.2007); *Landis v. Cardoza*, 515 F.Supp.2d 809 (E.D.Mich.2007); *Clark v. Thomas*, 505 F.Supp.2d 884 (D.Kan. 2007); *Alexander v. Newman*, 345 F.Supp.2d 876 (W.D.Tenn.2004); *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917 (E.D.Wis.1999); *Cornett v. Longois*, 871 F.Supp. 918 (E.D.Tex.1994); *Schwab v. Wood*, 767 F.Supp. 574 (D.Del.1991); *Masel v. Barrett*, 707 F.Supp. 4 (D.D.C.1989); *James v. District of Columbia*, 610 F.Supp. 1027 (D.D.C.1985); *Demetrius v. Marsh*, 560 F.Supp.

There should be no question that this case should proceed to trial with respect to Officer Tagayun.[4] Therefore, I dissent.

At the outset, I am in total agreement with my colleagues that we must be careful not to "Monday-morning" quarterback difficult split-second decisions about the amount of force necessary in particular situations made in circumstances that are tense, uncertain, and rapidly evolving,. *Bell v. Dawson,* 144 F.Supp.2d 454 (W.D.N.C.2001). This Court recognizes that police officers confront dynamic situations which require immediate decision-making about the amount of force to use-decisions which, in calmer reflection afterwards, might have been made differently. We need to insulate our law enforcement officers to a large extent from the constant fear that they will unnecessarily have to defend themselves from excessive force claims in every tough situation in which they find themselves, thereby risking that such officers will be unable to act quickly when it is necessary to protect themselves or the public. However, we must also not surrender our duty as a court to protect the public from unconstitutional acts by state actors against citizens.

1157 (E.D.Pa.1983); *Ladnier v. Murray,* 572 F.Supp. 544 (D.Md.1983); *Schiller v. Strangis,* 540 F.Supp. 605 (D.Mass.1982); *Pennsylvania v. Porter,* 480 F.Supp. 686 (W.D.Pa.1979), *aff'd in part and rev'd in part on other grounds,* 659 F.2d 306 (3rd Cir.1981); and *Arroyo v. Walsh,* 317 F.Supp. 869 (D.Conn.1970) (D. 420 (E.D. Tenn 1963).

Long ago, it was "clearly established" in the jurisprudence of this country that the type of brutality meted out by Officer Tagayun in these circumstances was objectively unreasonable and unconstitutional. Even if it were not, there are basic, fundamental, universally held precepts of acceptable behavior in a civilized society which compel a court to conclude that certain types of despicable conduct by a state actor are "clearly established" as wrong and understood to be improper simply by that actor being a member of that society. In other words, courts ought not permit bad state actors to escape accountability for certain unconstitutional acts visited upon innocent citizens by allowing that state actor to hide behind the doctrine of qualified immunity under the claim that no court has theretofore ruled improper the precise bad act done by the state actor in the unique circumstance encountered. The United States Supreme Court has explained that, for "clearly established" purposes, the focus is on the "contours of the right,"

The facts, taken in the light most favorable to David Botkins, the party asserting injury, indicate that once Officers Tagayun and Truitt arrived on the scene, the threat of violence from the confrontation between the two groups had dissipated. Mr. Botkins and the other individuals simply were standing around by this time because two of the potential adversaries had discovered that they knew each other. Nevertheless, Officer Tagayun, with his gun drawn, ordered everyone to get on the ground. This order was not improper. Mr. Botkins dutifully complied the best that he could but was hampered by his injured arm. As a result, he got down on his knees and put his arms in the air to show Officer Tagayun that he was wearing an arm cast. At that point, Officer Tagayun ran up to Mr. Botkins, threw Mr. Botkins' hands behind his back, put his knee in Mr. Botkins' back, and hit Mr. Botkins in the head with the butt of his gun. Mr. Botkins stated below that after the first hit with the butt of the gun, he could feel blood running down his head. Officer Tagayun then struck Mr. Botkins two more times with the butt of his gun, kicked him, and then, according to the com-

not on whether a citizen can somewhere find the exact same conduct ruled improper in a given jurisdiction. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

4. I do not believe there to be sufficient evidence or allegations herein to proceed against Officer Truitt. The essence of Mr. Botkins' claims herein are grounded in allegations of excessive force by Officer Tagayun. Initially, the claims made against Officer Truitt sound in "negligence," not "deliberation." Further, a thorough review of the record fails to find any factual support, save pure speculation, that Officer Truitt did anything wrong or that he could have stopped Officer Tagayun *even if he had known what might happen-which he didn't.* I do find it instructive that Officer Truitt testified to his training which included "non-lethal" means of control. Non-lethal control includes pepper spray, Tasers, etc. This raises the question not considered anywhere in the majority opinion: "If Officer Truitt, as a volunteer, was trained in non-lethal control techniques and had such techniques available to him that night, why did Officer Tagayun so greatly over-react and immediately resort to using a deadly weapon to pistol-whip Mr. Botkins when Mr. Botkins was being submissive to the extent he could given his physical incapacities at the time?"

plaint, spat on him. As a result of the savage beating, Mr. Botkins was transported to a hospital for treatment which included the application of seven staples to one head wound and three staples to another head wound. Importantly, Mr. Botkins was never prosecuted for, nor convicted of, any crime, including resisting arrest.

I disagree with the majority that a bright line does not exist here. It does without question. There is a big difference between a suspect who is physically challenged by a broken arm in a cast and is trying to communicate that inability to a police officer (as Mr. Botkins was doing here) and a suspect who is "refusing" to comply and who therefore reasonably poses a risk to the officer and to the situation.[5] By using the term, "refusal," to inaccurately describe Mr. Botkins' actions, one can understand how the majority got to the wrong result—it relied on an inaccurate conclusion of the facts. That is a risk when an appellate court involves itself in finding facts, an endeavor better left to juries. Mr. Botkins did not refuse to comply. Rather, he failed to get down on his belly, as ordered, because of his injured arm, a fact which was obvious, or should have been obvious, from the fact that he was wearing a cast. At the very least, Mr. Botkins' position was clearly one of submission. When Mr. Botkins was beaten by Officer Tagayun, he had committed no crime, was not actively resisting arrest or attempting to evade arrest by flight, and posed no immediate threat to the safety of the police officers or others.

Claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a citizen are properly analyzed under the Fourth Amendment and its "reasonableness" standard. *Albright v. Oli-*

*ver,* 510 U.S. 266, 276, 114 S.Ct. 807, 814, 127 L.Ed.2d 114 (1994). Courts have explained that

> [d]etermining whether acts [of a police officer] are reasonable requires careful attention to the facts and circumstances of the case. Three important factors to consider are the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Johnson v. City of Milwaukee,* 41 F.Supp.2d 917, 925 (E.D.Wis.1999) (citations omitted), *see also, Morales v. City of Oklahoma City,* 230 P.3d 869 (Ok.2010) (same); *Flynn v. Mills,* 361 F.Supp.2d 866 (S.D.Ind.2005) (same); *Heyward v. Christmas,* 357 S.C. 202, 593 S.E.2d 141 (S.C.2004) (same); *Campbell v. City of Leavenworth,* 28 Kan.App.2d 120, 13 P.3d 917 (2000) (same); *Limbert v. Twin Falls County,* 131 Idaho 344, 955 P.2d 1123 (Idaho App.1998) (same). That is, the question is whether the police officer's actions were "objectively reasonable" in light of the facts and circumstances confronting the officer.[6] Under these circumstances, the use of a deadly weapon to pistol-whip Mr. Botkins and the kicking of Mr. Botkins were not objectively reasonable for the situation and were clearly excessive. Officer Tagayun's conduct speaks more to punishment than an attempt to control a dynamic situation. *See Kokinda v. Breiner,* 557 F.Supp.2d 581 (M.D.Pa.2008) (officer's actions were allegedly taken to punish arrestee rather than for legitimate purposes).

According to Syllabus Point 6 of the majority opinion, in part, a public officer is not entitled to qualified immunity from civil damages for performance of discretionary functions where the court finds that the sub-

---

5. One wonders if Officer Tagayun would have also properly acted, within the reasoning of the majority, if he had pistol-whipped and kicked a pregnant woman who was attempting to communicate to him her condition while her hands were held up in a submissive position. In its attempt to extend protections to insulate police officers from liability for making tough decisions in "gray" areas on this appeal, the majority has gone too far and now excuses away clearly deplorable conduct by a state actor against a citizen.

6. In doing so, a court must devote "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 392, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

missions of the parties could establish the officer's conduct violated a constitutional right. As noted by the majority opinion, a constitutional violation may occur based simply on the general rule prohibiting excessive force. Mr. Botkins' constitutional rights were violated when Officer Tagayun used excessive force on him by viciously beating him on the head with the butt of his gun causing wounds which required ten staples to close.

Syllabus Point 6 of the majority opinion additionally provides that a public officer is not entitled to qualified immunity where it would be clear to a reasonable officer that such conduct is unlawful in the situation confronted. As referenced in footnote 3 herein, this country's jurisprudence in the last 50 years completely dispels any notion that a reasonable officer might consider what Officer Tagayun did in this case to be acceptable. This is not 1963 Birmingham, Alabama. This is not a modern-day third-world police state. This is the 21st Century and this is West Virginia. We stand for more. What Officer Tagayun did to Mr. Botkins was unjustified and unacceptable by any definition of acceptable behavior in this state or in this country and I am disappointed that this Court now immunizes him from the consequences of such actions.

All first responders, especially police officers, are professionals who courageously go about the business of protecting society in a responsible manner. They deserve our respect and appreciation. Unfortunately, actions such as those of Office Tagayun unfairly cause people to suspect and resent police officers. This suspicion and resentment can result in a lack of cooperation between civilians and police officers that frustrates law enforcement efforts. Further, actions such as those of Officer Tagayun may increase violent confrontations between police officers and suspects by causing some suspects to choose flight or resistance rather than compliance with a police officer's lawful commands.

I reiterate, while I agree with the majority opinion that a police officer may use lawful force to compel a recalcitrant suspect to adhere to the officer's commands, it should be obvious to any reasonable police officer and to this Court that lawful police conduct does not include brutally beating with the butt of a gun a helpless, nonthreatening, person who is on his knees with his arms above his head. It does not condone thereafter kicking the helpless individual. Officer Tagayun's use of force was excessive. It was wrongful. And, as any reasonable police officer would reasonably know, it was improper and unconstitutional. For these reasons, I would find that Officer Tagayun does not enjoy qualified immunity from civil damages because of the senseless harm done to Mr. Botkins. Accordingly, I dissent.